UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------X
DINO ANTOLINI,

             Plaintiff,          Case No.:1:19-cv-09674-JMF

  -against-                            DECLARATION IN SUPPORT
                                        OF DEFENDANTS' MOTION
HAROLD THURMAN, BRAD THURMAN,    FOR SUMMARY JUDGMENT
and 33 BRE INC.,

            Defendants.
----------------------------------------------X

STATE OF NEW YORK  )
                      : ss.
COUNTY OF NEW YORK)

    STEVEN KRATCHMAN, declares under penalty of perjury that the following is true and correct:

    1.    I am an Architect and Principal with Steven Kratchman Architect, P.C. I am a registered architect licensed to practice architecture by the State of New York. I practice in the field of general practice architecture in the New York City Metropolitan area. I submit this Declaration based on personal knowledge and my professional opinion in support of the summary judgment motion of Defendants.

    2.    In the course of approximately 30 years of practice, I have been the architect of record for approximately 130 to 150 submissions to DOB seeking permits for clients who wish to have architectural services performed. In order to make submissions to the permitting agencies, I must be, and I am, generally familiar with the New York City Building Code, the New York City Fire Code, the New York City Zoning Resolution, the rules of the LPC, the rules of the New York City Department of

Transportation, and other rules and codes issued by other city agencies. I also must be, and am, generally familiar with many of the technical and design standards of the Americans with Disabilities Act, particularly those applicable to wheelchair ramps and other means of wheelchair access into public places. I typically access these codes, rules, and technical standards in electronic form from my computer when I need to check on an exact rule number or confirm that my memory of a particular rule or a standard is accurate.

3. As the architect of record on a submission to DOB, LPC, or any other agency, I am responsible for signing and sealing all the architectural drawings submitted with an application. Only architects (or engineers) who are registered within the State of New York (i.e., licensed) are permitted to sign and seal architectural drawings that are submitted to NYC DOB and LPC. When a registered architect signs and seals a drawing that means he is certifying that the submitted drawings and forms are truthful, accurate, and are authored and/or directly reviewed by the architect.

4. I hold a Bachelor of Architecture degree from the University of Kansas, in Lawrence, Kansas and a Master's Degree in Urban Design/Urban Planning from the City of New York, New York, New York.

5. In particular, I make this Declaration to explain (1) the permits and approvals that are required in order to perform work with respect to access to and within the commercial units at 82-88 Fulton Street, New York, New York; (2) to explain why a wheel chair ramp and lift is highly unlikely to be approved for

construction by either the New York City Department of Buildings (DOB), the DOT or the LPC.

## *MY BACKGROUND*

6.   I am a principal of Steven Kratchman Architect, P.C. which I founded. A copy of my curriculum vitae is attached as **Exhibit " A "**.

7.   My firm provides architectural and design services to businesses and individuals for projects primarily located in the Metropolitan area of New York City. I am a member of the American Institute of Architect NYC Chapter, a member of Urban Land Institute and mixed use Development Council since 1999. I have practiced in the field of architecture for over 30 years.

### The Building and commercial units at 82-88 Fulton Street

8.   Alt Number 343/78, as approved 7/13/79, resulting in 1980 CO#80027, annexed as Exhibit **"H",** combined existing buildings under the 1968 Building Code into the present day mixed use building with residential and commercial uses. Four levels of commercial units (above and below the sidewalk) were designed to be accessed from Gold Street and Fulton Street via a system of exterior steps and balconies between the sidewalks and the entrances within an unenclosed arcade also referenced as Concourse. The different elevations of the commercial units and the balconies relate to the floor level elevations of original construction. If the same application were filed today the developer would need to remedy the inherent accessibility deficiencies for approval. However, the application predates the ADA regulations.

9.   In connection with my work as an expert in this case, I have visited the

3

building. My colleague Daniel Trophenov, a licensed architect in my firm, observed the Plaintiff's expert conduct a site visit on October 22, 2020 of the interior and exterior of the premises. I discussed the findings at length with my colleague and reviewed his notes and photos.

10. The nail spa is located at the cellar mezzanine level and accessed via a balcony at approximately 3 feet nine inches above grade.

11. Asia Wok was a restaurant, now vacated, which was located approximately 6 feet 6 inches above grade. Tandoor Palace is a restaurant located at the cellar mezzanine level and accessed via a balcony at approximately 6 feet to 6 inches above grade. Mr. Rafael's Cleaners and Tailoring is located at the cellar mezzanine level and accessed via balcony at approximately 6 feet 6 inches above grade.

12. D&E Buyers and Jewelers, now vacated, is located at the cellar level and has vacated. It is accessed via open steps down from the sidewalk to approximately 2 feet 5 inches below grade. Isaak Fulton Haircutters is a barbershop, now vacated, and was accessed via open steps down from the sidewalk to approximately 2 feet 5 inches above grade. Benny's Thai Café is a restaurant, now vacated, that was located at the cellar level and accessed via lower concourse and open steps down from the sidewalk approximately 2 feet 5 inches below grade. Wall Street Bath & Spa is a physical culture establishment located in several levels below grade with access via open steps from the sidewalk to approximately 2 feet 5 inches below grade.

13. The Commercial units are located on four different levels both above and

below the city sidewalk, and separated from the Public sidewalk by an area way and combination of steps up and down to various levels. We investigated for purposes of remediation including alternate solutions for access via ramps and handicapped lifts.

### THE PERMITS AND APPROVALS NECESSARY TO BUILDING A RAMP OR A LIFT AT 82-88 FULTON STREET

14. I prepared an initial report dated February 11, 2020 annexed as **Exhibit "B"** and a further architectural report dated September 29, 2020 annexed hereto as **Exhibit "C",** with respect to the issue of whether remediation is readily achievable for the location.

15. In our initial report from February 11, 2020, we referenced the complexity and difficulty involved in making the existing property compliant with ADA accessibility guidelines based on our preliminary review. On September 29, 2020, we issued a further report setting forth greater detail. See Report as Exhibit C.

16. In summary, the original building was developed and constructed in the 1970's prior to the requirements of ADA regulation in question. See diagrams annexed to Exhibit B.

17. We studied various access options including of ramps and other avenues of remediation in terms of the available space, changes of level to be accommodated, and the structural framing which may permit or inhibit ramps or other manner of remediation.

18. We investigated multiple options for providing access via a new handicapped platform lift or elevator.

19. Installation of a ramp or lift into the ground floor store at 82-88

Fulton Street requires a permit from DOB, and either project (ramp or lift) must comply with the New York City Building Code, the rules of the Fire Department (if impacting any fire safety elements), the Department of Transportation (if the project involves encroachment onto the public sidewalk). DOB reviews all proposed construction in the City for compliance with the New York City Building Code, Fire Code, DOT rules, and the Americans with Disabilities Act.

20. To apply for a permit for a project requiring LPC approval, the applicant must first submit an application to DOB for a permit, which includes an architectural drawing of the proposed construction. DOB can either issue an approval or raise objections to aspects of the proposed project that do not comply with the Building Code or the Fire Code, or the disability laws. If DOB has objections to the design, it issues a Notice of Objections (also known as an objection sheet) to the applicant. DOB may, but more often does not, include all of its objections in its first objection sheet. If the objections can be addressed, the applicant may revise their architectural drawings to address the objection, and submit the revised project to DOB. If DOB has additional objections, it issues another objection sheet. This process continues until the applicant has addressed all of DOB's objections. Once DOB has no more objections, it issues a clean objection sheet.

21. For small projects such as the installation of a ramp or lift, LPC will not consider the project until DOB has issued a clean objection sheet for the project (with the exception of the objection associated with not having obtained a Landmark Permit).

In more complex projects, such as new buildings, LPC will consider a proposal with an objection sheet that is cleared of only zoning objections. Once the applicant submits the clean objection sheet to LPC, the project is examined by a staff level reviewer. If the project involves only minor changes that do not affect the historically significant aspects of the property, the project may be approved at the LPC staff level, without the need for a public hearing. If the project would affect the property's historically significant elements, the project must go to an LPC public hearing.

22. The LPC approval process associated with a full hearing consists of staff level review, a community board hearing, and finally a hearing before the LPC itself. Initially, the applicant reviews its design with the LPC staff until the assigned staff member believes the design satisfactorily meets the requirements for presentation before the public and the Commission. The applicant must then appear for a public hearing before the New York City Community Board for the area in which the project is located. At that point, the Community Board can either approve or reject the project. The Community Board's determination is purely advisory to the Commission, but in practice carries significant weight with the commissioners' review of the proposal. The applicant must then present its proposal at a public hearing before the Commissioners of the LPC, at which members of the public can also speak. The Community Board's statement is read into the record along with any other city preservation groups, local community groups and/or individuals. The LPC Commissioners review the proposal to determine its effect on the historically significant features of the property, and, for

buildings that are within historic districts, its effect on nearby designated properties. The Commissioners then vote on the proposal and either approve, request specific alterations (to be presented again in a subsequent Public Meeting, or worked out with preservation staff), or reject the project.

23. The Commission does not normally approve dramatic alterations of historically significant features of landmarked properties that are not appropriate to the character of the building. When applications proposing dramatic alterations of historic features are submitted, there is often significant push back at the staff level, and staff instruct the applicant to revise design so as not to significantly alter the historic features of the property. The LPC will not approve a historically inappropriate project.

24. DOT controls the public sidewalks in the City. A project that encroaches onto the public sidewalk beyond the street line (i.e., the property line) must be approved by DOT through its issuance of a revocable consent. One exception is, under the Building Code, a wheelchair ramp may extend up to 44 inches beyond the property line without the owner having to obtain a revocable consent from DOT. Beyond that distance, a revocable consent is required. Under DOT rules, the grant of a revocable consent is conditioned on, among other things, the structure being removable upon instruction from DOT, and as the name suggests, the consent is revocable by DOT at any time. A revocable consent is also subject to Community Board (and public) review, which again is limited to an advisory statement.

25. We have explored alternate solutions for access via ramps. The greatest changes in level would require ramps about 124 feet long at the approximate 1:12 slope, including landings every 12 feet and at changes of direction. Per current Building Code and prior applicable memos, as-of-right ramp projections into the public right of way up to 44 inches are permitted only for buildings built before 1969, and only 18 inches for buildings developed after. This building falls into the latter category. Larger projections such as 44 inches are required for the ramp and are subject to discretional approval via variance. Nevertheless, access ramps of that length would be obstructions to the steps that serve as access to and egress from the commercial units at both levels, and would also constrict the public sidewalk circulation. Thus, for numerous reasons the ramp option is not a feasible option given the existing building and site conditions. Plaintiff's expert has conceded a ramp is not feasible.

26. DOB will object to a ramp including because it extends out onto the sidewalk more than 44 inches, in violation of the 44-inch limit in the Building Code. This cannot be cured by design because of the height of the steps and slope rules in the Building Code and the ADA, as it is not possible to design an ADA-compliant ramp that extends no more than 44 inches from the property line.

27. The plan, attached to the report, annexed as **Exhibit "C"** shows how an elevator might be located to serve the various levels. The following reasons explain why this scheme is not readily achievable: Two of the existing connected spaces would result in a loss of at least 250 square feet of net area from each unit. Additionally, there are necessarily elevator overruns. That is, the size of the shaft must be provided

above and below the elevator's path of travel. This would require an additional loss of approximately 64 square feet of space from the commercial space in the sub-cellar, and from the occupied residential unit above. This depletion of space including residential portions of the building precludes such a significant change to the demised areas.

28.     This scheme requires the use of an elevator with doors on three of the four sides of the cab.  There are no known models available from any reputable manufacturer.  Such a unit would be highly customized, and would likely require special engineering and approval from the Board of Standards and Appeals. The process would need to be undertaken by a willing manufacturer, which is outside the Defendants' control.  We welcomed Plaintiff's expert to make a concrete proposal for a readily achievable solution, which has not occurred.

29.     In Plaintiff's expert's exterior report dated November 16, 2020, annexed as **Exhibit** "**D**" related to a site inspection on July 28, 2020, Plaintiff's expert concedes a ramp is not feasible. He suggests two handicap lifts but likewise concedes this may not be feasible, and would require taking additional leasing area.  His report is stated in conclusory terms with no conceptual drawings attached. The implied location of a second lift to serve the stores located in the western portion is not understood and any such location would encroach on egress and access to the remaining stores, with loss of space and significant restructuring or reconfiguration. It would involve an extraordinary amount of work and restructuring of floor levels, loss of leased space and would not address access to all units.  It is highly unlikely that this would be feasible. See Defendants November 25, 2020 responsive report annexed as **Exhibit** "**E**".

30.     As for the Plaintiff's expert report of the interior dated November 16, 2020, annexed as **Exhibit "F"**, the site visit is more fully addressed in the Declaration of Daniel Trophelov, an architect employed with my firm.  A copy of the Defendants Interior report dated December 2, 2020 responsive to the Plaintiff expert's interior report is annexed as Exhibit **G**.

**WHEREFORE,** it is respectfully requested that Defendants motion be granted, together with such other and further relief as may be deemed just and proper.

Dated:  New York, New York
        December 2, 2020

_____
Steven Kratchman

S:\SV\DATA\Client\THURCON\Antolini v. Thurman-affidavit Steven Kratchman in support of summary judgment (Ver. 2) 11-13-20.docx